UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JUDITH DEBORAH SCOTT,

Plaintiff,

v.

NANCY A. BERRYHILL,

Defendant.

Case No. 17-cv-02832-DMR

**ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT**

Re: Dkt. Nos. 19, 20

Plaintiff Judith Deborah Scott moves for summary judgment to reverse the Commissioner of the Social Security Administration's (the "Commissioner's") final administrative decision, which found Scott not disabled and therefore denied her application for benefits under Titles II and XVI of the Social Security Act, 42 U.S.C. § 401 et seq. For the reasons stated below, the court grants Scott's motion in part, denies the Commissioner's motion, and remands this case for further proceedings.

I.    **PROCEDURAL HISTORY**

Scott filed applications for Social Security Disability Insurance (SSDI) benefits and supplemental security income (SSI) on March 20, 2012, alleging disability beginning January 1, 2011. Her applications were initially denied on August 28, 2012 and again on reconsideration on May 7, 2013. Administrative Record ("A.R.") 320-321, 322-330, 118-122, 126-131. Scott filed a request for a hearing before an Administrative Law Judge (ALJ) on May 28, 2013. A.R. 132-134. ALJ Nancy Lisewski held a hearing on July 27, 2015. A.R. 38-61.

After the hearing, ALJ Lisewski issued a decision finding Scott not disabled. A.R. 17-31. The ALJ determined that Scott has the following severe impairments: alcohol abuse and depressive disorder, not otherwise specified. A.R. 23. The ALJ found that if Scott "stopped the substance use, the remaining limitations would not cause more than a minimal impact on [her]

ability to perform basic work activities; therefore, [Scott] would not have a severe impairment or combination of impairments." A.R. 25. The ALJ concluded that "[b]ecause the substance use disorder is a contributing factor material to the determination of disability, [Scott] has not been disabled within the meaning of the Social Security Act at any time from the alleged onset date through the date of this decision." A.R. 30.

The Appeals Council denied Scott's request for review on March 13, 2017. A.R. 1-6. The ALJ's decision therefore became the Commissioner's final decision. *Taylor v. Comm'r of Soc. Sec. Admin.*, 659 F.3d 1228, 1231 (9th Cir. 2011). Scott then filed suit in this court pursuant to 42 U.S.C. § 405(g).

## II.    THE FIVE-STEP SEQUENTIAL EVALUATION PROCESS

To qualify for disability benefits, a claimant must demonstrate a medically determinable physical or mental impairment that prevents her from engaging in substantial gainful activity[1] and that is expected to result in death or to last for a continuous period of at least twelve months. *Reddick v. Chater*, 157 F.3d 715, 721 (9th Cir. 1998) (citing 42 U.S.C. § 423(d)(1)(A)). The impairment must render the claimant incapable of performing the work she previously performed and incapable of performing any other substantial gainful employment that exists in the national economy. *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 42 U.S.C. § 423(d)(2)(A)).

To decide if a claimant is entitled to benefits, an ALJ conducts a five-step inquiry. 20 C.F.R. §§ 404.1520, 416.920. The steps are as follows:

1.    At the first step, the ALJ considers the claimant's work activity, if any. If the claimant is doing substantial gainful activity, the ALJ will find that the claimant is not disabled.

2.    At the second step, the ALJ considers the medical severity of the claimant's impairment(s). If the claimant does not have a severe medically determinable physical or mental impairment that meets the duration requirement in [20 C.F.R.] § 416.909, or a combination of impairments that is severe and meets the duration requirement, the ALJ will find that the claimant is not disabled.

---

[1] Substantial gainful activity means work that involves doing significant and productive physical or mental duties and is done for pay or profit. 20 C.F.R. §§ 404.1510, 416.910.

3.        At the third step, the ALJ also considers the medical severity of the claimant's impairment(s). If the claimant has an impairment(s) that meets or equals one of the listings in 20 C.F.R., Pt. 404, Subpt. P, App. 1 [the "Listings"] and meets the duration requirement, the ALJ will find that the claimant is disabled.

4.        At the fourth step, the ALJ considers an assessment of the claimant's residual functional capacity ("RFC") and the claimant's past relevant work. If the claimant can still do his or her past relevant work, the ALJ will find that the claimant is not disabled.

5.        At the fifth and last step, the ALJ considers the assessment of the claimant's RFC and age, education, and work experience to see if the claimant can make an adjustment to other work. If the claimant can make an adjustment to other work, the ALJ will find that the claimant is not disabled. If the claimant cannot make an adjustment to other work, the ALJ will find that the claimant is disabled.

20 C.F.R. § 416.920(a)(4); 20 C.F.R. §§ 404.1520; *Tackett*, 180 F.3d at 1098-99.

## III.    FACTUAL BACKGROUND

### A.    Scott's Testimony

Scott testified that she was 61 on the date of the hearing. She spent the night before the hearing in a car that she borrowed from someone. She had lived with her mother before her mother moved to a care home. A.R. 42-43. Scott receives general assistance. She testified that she sells "odds and ends" and "thing that people throw out" at the flea market, even though it is "a lot of work," because it "makes [her] feel like [she's] doing something and not just, you know, sitting around." A.R. 44. She testified that it is not very "lucrative"; for example, she made on $38 selling items at the flea market on the day before the hearing. A.R. 44. In describing the work at the flea market, Scott testified that there is "always something to do, like, to make sure that people aren't stealing," and that it is "a lot of lifting and it's nonstop stuff." A.R. 45. She also testified that she has a lot of foot pain "and the longer [she's] on them the more they hurt," and described the work as "taxing." A.R. 45. She started selling items at the flea market when she needed to get rid of things that she could not afford to keep in storage. A.R. 46.

Scott's last paid position was at Berkeley Bowl, a job that offered health insurance.

3

According to Scott, she took the position because she was "desperate to get [her] feet operated on," so six months after starting she had surgery on one foot. A.R. 47. She was unable to take time off to have surgery on her other foot, so she "deliberately . . . got [herself] fired" so she could use COBRA for her second surgery. A.R. 47-48. Prior to that, she worked as a sous chef and was laid off shortly before the business closed. A.R. 46-47. Before that position she worked for California State Parks and was terminated following an alcohol relapse. A.R. 47.

When asked why she is not currently working, Scott testified that she thinks that her "behavior is inappropriate sometimes." She continued:

> [F]or an example would be my behavior yesterday with—it was some things happened and I got very, very angry and, you know, I was very volatile. I just don't think I handle the situation like normal people handle things. . . . Little things seem really big to me.

A.R. 48-49. Scott testified that those feelings happen more when she is under a lot of stress and testified about the difficulty of being homeless given her age and need for safety: "I just feel like I'm a fugitive, you know, I feel like I'm an animal, you know . . . I just feel like a crazed animal that's running scared all the time." A.R. 49.

Scott testified about her use of alcohol, stating that she thinks that her drinking "is a symptom of something else," that "[i]t's just what I do to give up." A.R. 50. She drinks because of "despondency and wanting just to give up, and that "[i]t's not like drinking has made me—has caused these problems for me, it's other problems that caused the drinking." A.R. 50. Those problems include "heavy duty life stuff," including her brother's murder, her father's death from cancer, her own experience of breast cancer, her "unexpected and painful divorce," the death of five close friends, and the fact that she's "seen a lot of tragedy." A.R. 50. Scott testified that alcoholism runs in her family and that she no longer drinks. A.R. 51. She has been sober since May 2013, when her mother "had her final strokes" and it was a "pretty crazy time." A.R. 51-52. She maintains her sobriety by attending Atheist Agnostic meetings and calling friends. A.R. 52.

Scott testified that on an average day, she generally does "immediate things, survival type things," such as making sure she eats. A.R. 53. Scott spends time with others in the homeless community and recently began riding a bicycle, which helps with her foot pain. A.R. 53-54. She takes Zoloft and was prescribed Neurontin, but does not take it because of side effects. A.R. 53.

4

1    She takes ibuprofen for pain.  A.R. 53.

2        Scott testified that she occasionally has difficulty finishing something she has started, and

3    that she has trouble concentrating and remembering things.  A.R. 55.  She also has difficulty

4    multi-tasking.  As Scott testified, "[i]t's like going to the supermarket and buying something used

5    to be no problem.  It's like I feel like I'm taking forever to put everything back in my wallet, and I

6    feel like I'm keeping—holding up the line.  It just—everything seems hard."  A.R. 56.

7        **B.    Relevant Medical Evidence**

8            **1.    Nicholas Bagnell, Mental Health Trainee & Tenli Yavneh, Psy.D.**

9        Nicholas Bagnell, a Mental Health Trainee ("MHT") at Berkeley Mental Health,

10   completed a Mental Disorder Questionnaire Form on July 23, 2012, which was co-signed by

11   Clinical Director Tenli Yavneh, Psy.D.  A.R. 564-568.  Bagnell wrote that he had been treating

12   Scott on a weekly basis for three months.  A.R. 568.

13       Bagnell noted that Scott had been hospitalized numerous times for emergency psychiatric

14   services, and that she reported "wanting to 'be able to deal with life on life's terms, to avoid

15   continued self-medication with alcohol.  Sort through and confront elements of grief and trauma.'"

16   A.R. 564.  Bagnell wrote that Scott is often tearful, fearful, and depressed.  According to Bagnell,

17   Scott can function "relatively well with day to day activities," but has difficulty using appropriate

18   coping skills "when confronted with a large stressor."  A.R. 565.  He noted that Scott "has

19   difficulty interacting with others she perceives as being threatening and defends herself," and is

20   "more reactive and fearful of the potential for violence and danger."  A.R. 567.  Bagnell noted that

21   he had not administered testing to determine her "level of focused attention," but that she is able to

22   focus in session.  He wrote that "[s]he may have trouble when she experiences distress.

23   Interactions with supervisors may be triggering for her if she feels threatened."  A.R. 567.

24       Bagnell diagnosed Scott with alcohol dependence, posttraumatic stress disorder, and

25   adjustment disorder, and wrote that her condition could be expected to improve once she "is able

26   to procure her own living situation and independence."  A.R. 568.

27           **2.    State Agency Psychological Consultants**

28       Dan Funkenstein, M.D., reviewed Scott's medical records and assessed her mental residual

functional capacity on August 22, 2012.  A.R. 62-74.  Dr. Funkenstein opined that Scott is moderately limited in her ability to understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, sustain an ordinary routine without special supervision, work in coordination with or in proximity to others without being distracted by them, and complete a normal workday and workweek without interruptions from psychologically based symptoms.  A.R. 72-73.  He also opined that Scott is moderately impaired in her ability to interact appropriately with the general public and accept instructions and respond appropriately to criticism from supervisors.  A.R 73.  According to Dr. Funkenstein, Scott is capable of performing non-public, simple repetitive tasks when clean and sober.  A.R. 73.

On May 6, 2013, on reconsideration, L. O. Mallare, M.D., reviewed medical records and assessed the same mental limitations as Dr. Funkenstein.  A.R. 99-101.  Dr. Mallare opined that Scott is capable of performing non-public, simple repetitive tasks when clean and sober.  A.R. 101.

### 3.    State Agency Medical Consultants

On July 18, 2012, L. Pancho, M.D. reviewed Scott's medical records and assessed her physical residual functional capacity.  A.R. 69-72.  Dr. Pancho determined that Scott has the severe impairment of dysfunction—major joints, A.R. 69, and opined that Scott is limited with pushing and pulling in her lower extremities due to a history of "chronic foot pain due to bunion deformities s/p bunionectomy on the left."  A.R. 71.

On May 6, 2013, P. N. Ligot, M.D. affirmed Dr. Pancho's assessment of Scott's physical limitations.  A.R. 95-96, 98-99.

### 4.    Katherine Wiebe, Ph.D.

Katherine Wiebe, Ph.D., performed a consultative psychological examination of Scott on November 20, 2012.  A.R. 901-916.  Scott reported that her medical problems include "neuropathy in her feet, degenerative disc problems, and pain in her left arm and shoulder," and that she has had multiple hospitalizations for severe depression and alcohol abuse.  A.R. 902.  She reported having been clean and sober since July 2012.  According to Dr. Wiebe, Scott "evinced

6

mild to moderate impairments of reasoning, insight, and judgment due to her psychiatric symptoms." A.R. 904.

In addition to a clinical interview, Dr. Wiebe administered 10 tests. She estimated Scott's IQ to be in the high average range, and assessed moderate impairments in Scott's attention, concentration, and persistence and executive functioning. A.R. 905. Scott's functioning was normal in the domains of memory, language, visual/spatial abilities, and sensory/motor abilities. A.R. 905-906. Based on test results, Dr. Wiebe concluded that Scott is not malingering and "is experiencing a severe mental disorder." A.R. 909.

Dr. Wiebe diagnosed Scott with posttraumatic stress disorder; major depressive disorder, severe, without psychotic features; bipolar disorder NOS; generalized anxiety disorder; and alcohol dependence in early full remission. She also diagnosed Scott with narcissistic personality disorder, with negativistic personality traits, antisocial personality features, and sadistic personality features. A.R. 913. Dr. Wiebe opined that Scott is markedly impaired in her ability to maintain attention and concentration; accept instructions and respond appropriately to criticism from supervisors; and respond appropriately to changes in a routine work setting and deal with normal work stressors. She opined that Scott is extremely impaired in her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms. She also opined that Scott is moderately impaired in three areas of abilities and aptitudes to do unskilled work, including her ability to get along and work with others. A.R. 916.

### 5. John Prosise, Ph.D.

John Prosise, Ph.D., performed a consultative psychological examination of Scott on October 2, 2013. A.R. 838-843. Dr. Prosise noted that Scott "responded cautiously to prompts," "complied selectively with direction," and "fielded unfamiliar questions without distress." She was alert, oriented, and attentive during her interview, with intact concentration. Her insight "seemed normal" while her judgment "seemed limited," and her fund of information "was implausibly limited." Dr. Prosise noted that her "affect was normal, despite one interlude of histrionic tears." A.R. 838.

Scott reported that she had been taking Zoloft for depression for 15 years, and that she

7

"takes a low dosage now, with target symptoms including 'just not taking care of things,' including 'not opening mail.'" She did not report any other treatment for psychiatric complaints. A.R. 839. Scott admitted a history of alcohol abuse, starting at age 21, and reported last consuming alcohol one month before the examination, ending a binge in which she consumed three quarters of a fifth of a gallon vodka per day. A.R. 839.

Dr. Prosise assessed Scott's cognitive abilities. Scott scored in the borderline and low average ranges for WAIS-IV indices and full scale IQ, but Dr. Prosise noted that these scores were "due to willful item rejections and inventive errors." He concluded that "[m]ost scores underrepresented her demonstrated abilities." A.R. 839. He further wrote that "[p]ro bono screening with the Rey-15 returned a score of 6 (of 15), which revealed naively extensive, willful errors." A.R. 840.

Dr. Prosise diagnosed Scott with malingering, alcohol dependence, and depressive disorder NOS. A.R. 840. According to Dr. Prosise, Scott's ability to work is "reportedly limited by interpersonal conflicts and unspecified 'physical limitations,'" but he concluded that her ability to work "is impeded more prominently by alcohol dependence" and "is complicated by longstanding, neglected depression." A.R. 840. He opined that by her own reporting Scott is moderately impaired in social interaction, but that he concluded that she is unimpaired in that area. The only impairment he assessed was a mild impairment in Scott's psychological adaptability: "She has the ability to adjust adequately to physically feasible workplace demands requirements, hazards, and changes of routine, health and sobriety permitting." A.R. 840.

### 6. Patricia Jones, Marriage and Family Therapist Intern & Lesleigh Franklin, Ph.D.

Patricia Jones, Marriage and Family Therapist Intern ("MFTI"), completed a mental impairment questionnaire on August 19, 2015, supervised by Lesleigh Franklin, Ph.D. A.R. 1042-1046. Jones noted that she had had weekly 50-minute sessions with Scott, A.R. 1042, and the record contains Jones's therapy notes for Scott for the time period February 2015 through May 2015. *See* A.R. 1018-1041.

In the questionnaire, Jones noted Scott's diagnoses of generalized anxiety and borderline

personality. She wrote that Scott is not a malingerer and that her conditions were expected to last at least 12 months. She opined that Scott's impairments would cause her to be absent from work more than four days per month. A.R. 1042.

Jones opined that Scott is markedly impaired in her ability to deal with the stress of semiskilled and skilled work. She opined that Scott is moderately impaired in her ability to set realistic goals or make plans independently of others, maintain socially appropriate behavior, and maintain social functioning. A.R. 1043. Jones also opined that Scott is mildly impaired in several areas, including the ability to understand and remember detailed instructions and carry out detailed instructions. A.R. 1043. Scott's symptoms include impairment in impulse control, mood disturbance, and emotional lability. A.R. 1045.

In response to the question, "Please describe any additional reasons not covered above why your patient would have difficulty working at a regular job on a sustained basis," Jones wrote:

> Difficulty dealing with [illegible]. Abrupt mood changes. Dysphoric mood with a fragile sense of self. A chronic sense of emptiness and history of unstable relationships.

A.R. 1046.

## IV.    STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), this court has the authority to review a decision by the Commissioner denying a claimant disability benefits. "This court may set aside the Commissioner's denial of disability insurance benefits when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Tackett*, 180 F.3d at 1097 (citations omitted). Substantial evidence is evidence within the record that could lead a reasonable mind to accept a conclusion regarding disability status. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is more than a mere scintilla, but less than a preponderance. *See Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir.1996) (internal citation omitted). When performing this analysis, the court must "consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006) (citation and quotation marks omitted).

If the evidence reasonably could support two conclusions, the court "may not substitute its

9

judgment for that of the Commissioner" and must affirm the decision. *Jamerson v. Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997) (citation omitted). "Finally, the court will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that the ALJ's error was inconsequential to the ultimate nondisability determination." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (citations and internal quotation marks omitted).

## V.    ISSUES PRESENTED

Scott challenges the ALJ's decision on several grounds. She argues that the ALJ erred 1) in determining her severe impairments; 2) in weighing the medical opinions; 3) in determining that her substance use is material; and 4) in assessing Scott's credibility.

The Commissioner cross-moves to affirm, arguing that the ALJ's decision is supported by substantial evidence and is free of legal error.

## VI.    DISCUSSION

### A.    Evaluation of Scott's Medical Impairments

Scott argues that the ALJ erred by not including personality disorder, anxiety disorder, and posttraumatic stress disorder in her analysis and by failing to find that they are severe impairments. She also argues that the ALJ erred by failing to discuss evidence of her physical impairments and failing to find that they are severe impairments.

#### 1.    Legal Standard

At step two of the five-step sequential evaluation for disability claims, the ALJ must determine whether the claimant has one or more severe impairments that significantly limit a claimant's ability to perform basic work activities. 20 C.F.R. §§ 404.1520(a)(4)(ii) and (c); 416.920(a)(4)(ii) and (c). "Basic work activities are abilities and aptitudes necessary to do most jobs, including, for example, walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling." *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996) (quotation omitted). The Ninth Circuit has held that "the step-two inquiry is a de minimis screening device to dispose of groundless claims." *Id.* (citation omitted). "An impairment or combination of impairments can be found 'not severe' only if the evidence establishes a slight abnormality that has no more than a minimal effect on an individual[']s ability to work." *Id.* (quotations omitted). A severe

United States District Court
Northern District of California

impairment "must be established by objective medical evidence from an acceptable medical source," 20 C.F.R. § 416.921, and the ALJ must "consider the claimant's subjective symptoms, such as pain or fatigue, in determining severity." *Smolen*, 80 F.3d at 1290 (citations omitted). In addition, when assessing a claimant's RFC, an ALJ must consider all of the claimant's medically determinable impairments, both severe and non-severe. 20 C.F.R. §§ 416.920(e), 416.945; *see Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1164 (9th Cir. 2008); *see also* SSR 96-8p, 1996 WL 374184, at *5 ("In assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments [because] limitations due to such a 'not severe' impairment may prevent an individual from performing past relevant work or may narrow the range of other work that the individual may still be able to do.").

## 2. Analysis

### a. Mental Impairments

The court concludes that the ALJ erred by omitting Scott's diagnoses of personality disorder, anxiety disorder, and posttraumatic stress disorder in her analysis. The record shows that treating and examining physicians and providers diagnosed Scott with these impairments and opined that these disorders resulted in symptoms that would likely have more than a minimal effect on Scott's ability to work.

In July 2012, after three months of treating Scott, MHT Bagnell, who was supervised by psychologist Dr. Yavneh, diagnosed Scott with posttraumatic stress disorder and adjustment disorder, in addition to alcohol dependence. A.R. 568.

In November 2012, Dr. Wiebe examined Scott and administered a battery of tests. In addition to major depressive disorder and alcohol dependence, which the ALJ found were severe impairments, Dr. Wiebe diagnosed Scott with posttraumatic stress disorder; bipolar disorder NOS; generalized anxiety disorder; and narcissistic personality disorder, with negativistic personality traits, antisocial personality features, and sadistic personality features. A.R. 913. Dr. Wiebe offered the following opinion about the impact of Scott's mental disorders:

> [Scott's] psychiatric and personality disorder symptoms are chronic and primary for her. These problems may also significantly affect her cognitive abilities and emotional functioning at times. Combined,

these problems make her ability to function in the workplace likely to
be at least intermittently unreliable for at least two years.

A.R. 912.

Almost three years later, in a 2015 mental impairment questionnaire, treating mental health provider MFTI Jones and her supervisor Dr. Franklin noted Scott's diagnoses of generalized anxiety and borderline personality. A.R. 1042. Jones opined that Scott is markedly impaired in her ability to deal with the stress of work and moderately impaired in numerous categories of mental abilities necessary to work. A.R. 1043. Jones's treatment notes consistently reflect the borderline personality diagnosis. *See* A.R. 1018-1041.

In her opinion, the ALJ noted that Scott "has . . . been diagnosed with depression, bipolar disorder, PTSD, generalized anxiety disorder, and borderline personality disorder," A.R. 28, but failed to otherwise discuss the disorders of personality disorder, anxiety disorder, and posttraumatic stress disorder in the opinion. She did not include them among Scott's severe impairments, apparently determining that these impairments would have no more than a minimal effect on Scott's ability to work. However, the opinion contains no discussion or explanation of how she reached that determination. Further, to the extent that the ALJ determined that Scott's diagnoses of personality disorder, anxiety disorder, and posttraumatic stress disorder were *not* severe, she erred in failing to analyze the disorders' individual and combined effect on Scott's functioning, or the impact of Scott's alcohol abuse on each of these disorders, separately and in combination. *See Howard ex rel. Wolff v. Barnhart*, 341 F.3d 1006, 1012 (9th Cir. 2003) ("the ALJ must consider the 'combined effect' of all the claimant's impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity." (citing 20 C.F.R. § 416.923)).

The Commissioner does not dispute that the ALJ failed to discuss Scott's personality disorder, anxiety disorder, and posttraumatic stress disorder in any detail, but argues that the ALJ did not err because "these uncertain diagnoses were insufficient to support finding that Plaintiff was severely impaired from these conditions." Opp'n 6. However, the ALJ herself made no such finding in the opinion. "Long-standing principles of administrative law require [this court] to review the ALJ's decision based on the reasoning and factual findings offered by the ALJ—not

post hoc rationalizations that attempt to intuit what the adjudicator may have been thinking." *Bray v. Comm'r of Soc. Sec. Admin*., 554 F.3d 1219, 1225-26 (9th Cir. 2009) (citation omitted). "A clear statement of the agency's reasoning is necessary because [the court] can affirm the agency's decision to deny benefits only on the grounds invoked by the agency." *Brown-Hunter v. Colvin*, 806 F.3d 487, 492 (9th Cir. 2015). Moreover, the record does not support a finding that the diagnoses were "uncertain"; as discussed above, Scott's treating providers affirmatively, consistently diagnosed these disorders, as did a consultative examiner. Accordingly, the court concludes that substantial evidence does not support the ALJ's determination of Scott's severe mental impairments.

### b.    Physical Impairments

Scott next argues that the ALJ erred by failing to discuss any of her physical impairments and pain allegations. The record contains diagnoses of numerous physical impairments, including bunion deformity in both of Scott's feet, status post-bunionectomies, A.R. 487-552; cervical disk narrowing, degenerative changes, and cervical disk disease, A.R. 592, 726; cervical spondylosis at C5-C6 and facet arthropathy resulting in mild to moderate neural foraminal stenosis, A.R. 726; and severe degenerative disk disease in the lower thoracic spine, A.R. 728. The records show that Scott regularly complained of chronic pain in her feet, legs, back, neck, and shoulder, as well as difficulty walking and standing, for which she was prescribed prescription pain medication (Norco). A.R. 422 (prescribed Norco for pain), 438-439 (increased pain with walking and standing), 441 (listing Norco for pain), 453 ("Foot and leg problems worsened with living conditions"), 487 (reason for visit: chronic bunion pain); 552 (complaints of foot pain with weight bearing activities), 807-816 (complaints of chronic pain), 1011-1015 (complaints of chronic pain). Scott testified at the hearing about chronic pain in her feet, A.R. 45, 53, and described pain while standing and walking and shoulder pain in her October 2012 request for reconsideration of her benefits application. A.R. 438-445. Further, Dr. Pancho and Dr. Ligot, the state agency medical consultants, determined that Scott has the severe impairment of "dysfunction—major joints," A.R. 69, and each concluded that Scott is limited with pushing and pulling in her lower extremities due to a history of "chronic foot pain due to bunion deformities s/p bunionectomy on the left." A.R.

69, 71, 95-96, 98-99.

Despite this evidence, the ALJ did not discuss Scott's physical impairments at any length in her opinion. She did not discuss the opinions of Drs. Pancho and Ligot at all. When assessing Scott's RFC, the ALJ was required to consider *all* of her medically determinable impairments, both severe and non-severe. 20 C.F.R. §§ 416.920(e), 416.945; *Carmickle*, 533 F.3d at 1164; *see also* SSR 96-8p, 1996 WL 374184, at *5 ("In assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments [because] limitations due to such a 'not severe' impairment may prevent an individual from performing past relevant work or may narrow the range of other work that the individual may still be able to do."); *Howard ex rel. Wolff*, 341 F.3d at 1012 ("("the ALJ must consider the 'combined effect' of all the claimant's impairments"). The Commissioner argues that the ALJ's decision not to find any severe physical impairments was reasonable and supported by substantial evidence, Opp'n 7, but as noted above, the court is precluded from reviewing the ALJ's decision based on "post hoc rationalizations that attempt to intuit what the adjudicator may have been thinking." *Bray*, 554 F.3d at 1225-26 (citation omitted). The court concludes that the ALJ erred by failing to discuss evidence of Scott's physical impairments.

## B.     Weighing of the Medical Evidence

The ALJ discussed the medical evidence and stated that she gave substantial weight to the opinion of examining physician Dr. Prosise. A.R. 28. She stated that she gave "some weight" to the opinion of examining physician Dr. Wiebe, but later in the opinion stated that she gave Dr. Wiebe's opinion "little weight"; little weight to the opinion of MFTI Jones and Dr. Franklin; little weight to the opinions of Dr. Funkenstein and Dr. Mallare, the state agency psychological consultants; and "some weight" to the opinion of MHT Bagnell and Dr. Yavneh. A.R. 25, 29-30.

As discussed above, the ALJ did not discuss the opinions of Dr. Pancho and Dr. Ligot, the state agency medical consultants, nor did she assign any weight to their opinions.

Scott argues that the ALJ erred in giving less weight to the opinions of Dr. Wiebe, MFTI Jones and Dr. Franklin, Dr. Funkenstein, Dr. Mallare, MHT Bagnell and Dr. Yavneh in favor of Dr. Prosise's opinion, and erred in failing to address the opinions of Dr. Pancho and Dr. Ligot.

### 1. Legal Standard

Courts employ a hierarchy of deference to medical opinions based on the relation of the doctor to the patient. Namely, courts distinguish between three types of physicians: those who treat the claimant ("treating physicians") and two categories of "nontreating physicians," those who examine but do not treat the claimant ("examining physicians") and those who neither examine nor treat the claimant ("non-examining physicians"). *See Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). A treating physician's opinion is entitled to more weight than an examining physician's opinion, and an examining physician's opinion is entitled to more weight than a non-examining physician's opinion. *Id.*

The Social Security Act tasks the ALJ with determining credibility of medical testimony and resolving conflicting evidence and ambiguities. *Reddick*, 157 F.3d at 722. A treating physician's opinion, while entitled to more weight, is not necessarily conclusive. *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989) (citation omitted). To reject the opinion of an uncontradicted treating physician, an ALJ must provide "clear and convincing reasons." *Lester*, 81 F.3d at 830; *see, e.g.*, *Roberts v. Shalala*, 66 F.3d 179, 184 (9th Cir. 1995) (affirming rejection of examining psychologist's functional assessment which conflicted with his own written report and test results); *see also* 20 C.F.R. § 416.927(d)(2); SSR 96-2p, 1996 WL 374188 (July 2, 1996). If another doctor contradicts a treating physician, the ALJ must provide "specific and legitimate reasons" supported by substantial evidence to discount the treating physician's opinion. *Lester*, 81 F.3d at 830. The ALJ meets this burden "by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Reddick*, 157 F.3d at 725 (citation omitted). "[B]road and vague" reasons do not suffice. *McAllister v. Sullivan*, 888 F.2d 599, 602 (9th Cir. 1989). This same standard applies to the rejection of an examining physician's opinion as well. *Lester*, 81 F.3d at 830-31. A non-examining physician's opinion alone cannot constitute substantial evidence to reject the opinion of an examining or treating physician, *Pitzer v. Sullivan*, 908 F.2d 502, 506 n.4 (9th Cir. 1990); *Gallant v. Heckler*, 753 F.2d 1450, 1456 (9th Cir. 1984), though a non-examining physician's opinion may be persuasive when supported by other factors. *See Tonapetyan v. Halter*, 242 F.3d

1144, 1149 (9th Cir. 2001) (noting that opinion by "non-examining medical expert . . . may constitute substantial evidence when it is consistent with other independent evidence in the record"); *Magallanes*, 881 F.2d at 751-55 (upholding rejection of treating physician's opinion given contradictory laboratory test results, reports from examining physicians, and testimony from claimant). An ALJ "may reject the opinion of a non-examining physician by reference to specific evidence in the medical record." *Sousa v. Callahan*, 143 F.3d 1240, 1244 (9th Cir. 1998) (citation omitted). An opinion that is more consistent with the record as a whole generally carries more persuasiveness. *See* 20 C.F.R. § 416.927(c)(4).

### 2. Analysis

#### a. Dr. Wiebe

Dr. Wiebe examined Scott on November 20, 2012 and administered numerous tests. Based on test results, Dr. Wiebe concluded that Scott is not malingering and "is experiencing a severe mental disorder." A.R. 909. Dr. Wiebe opined that Scott is markedly impaired in her ability to maintain attention and concentration; accept instructions and respond appropriately to criticism from supervisors; and respond appropriately to changes in a routine work setting and deal with normal work stressors. She opined that Scott is extremely impaired in her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms. She also opined that Scott is moderately impaired in three areas of abilities and aptitudes to do unskilled work, including her ability to get along and work with others. A.R. 916.

The ALJ's discussion of Dr. Wiebe's opinion is internally inconsistent. First, the ALJ accorded "some weight" to the opinion, which Dr. Wiebe provided "when the claimant's alcohol dependence was in early remission." A.R. 25. The ALJ describes Dr. Wiebe's opinion that Scott is "moderately impaired in terms of attention/concentration/persistence, as she was easily distracted, required frequent redirection and repetition of instructions, and evinced lapses in attention as well as blocking when emotional material was evoked." A.R. 25. However, elsewhere in the decision, the ALJ accorded "little weight" to Dr. Wiebe's opinion in favor of Dr. Prosise's opinion, who concluded that Scott was only mildly impaired in psychological adaptability and was otherwise unimpaired. A.R. 29, 840. Given the contradictions between the

1    opinions by Dr. Wiebe and Dr. Prosise, the ALJ was required to provide "specific and legitimate

2    reasons" supported by substantial evidence to reject Dr. Wiebe's opinion. *Lester*, 81 F.3d at 830.

3          The sole reason the ALJ gave for providing little weight to Dr. Wiebe's opinion was that it

4    "is inconsistent with the evidence of record, which indicates much improved functioning during

5    periods of sobriety, as discussed above." A.R. 29. It appears that the ALJ is referring to her

6    discussion of five treatment notes from 2012 and 2013 on page nine of the opinion (A.R. 28), as

7    follows: a 2012 treatment note in which Scott "reported doing well on sertraline," "was more

8    active and motivated and she had gotten a new job, which she was enjoying, although she had to

9    be on her feet all day" (A.R. 816); a June 2012 report "that she was doing well on Norco,

10   sertraline, and ibuprofen" (A.R. 815); a July 2012 report that she was "under a lot of stress

11   because her mother, who lives in Stockton, had 3 strokes the prior month; however, she reported

12   doing okay and 'keeping it together'" (A.R. 814); an October 2012 report that "her mother was out

13   of the hospital and stable and that she had been traveling back and forth from Stockton" (A.R.

14   813); and a February 2013 report that "she had been sober for one year, was attending AA

15   meetings on occasion, and had 'no desire to drink,'" that "her primary stressor was economic, as

16   she was currently homeless and staying with friends," but that she would soon be moving in with

17   her mother as her caretaker, and that she "has a sister in the area and that they get along" (A.R.

18   809). A.R. 28.

19         The court finds that the one reason given by the ALJ to discount Dr. Wiebe's opinion --

20   namely, that it was inconsistent with evidence showing that Scott had improved functioning when

21   she was sober -- is not a specific and legitimate reason supported by substantial evidence to

22   discount that opinion. Importantly, Dr. Wiebe conducted her examination of Scott during a period

23   when Scott was sober, undercutting the ALJ's stated rationale for assigning the opinion less

24   weight. *See* A.R. 904 (noting that Scott reported being clean since July 2012). Further, all of the

25   records the ALJ cites in support of her conclusion that Scott had "much improved functioning"

26   while sober are from a limited period of time and from one provider, West Berkeley Family

27   Practice, Scott's treating provider for primary medical care. Only one of the five treatment notes

28   reflects treatment by the practice's "psychosocial services" division, and reflects a brief, 20-

17

minute session with a social worker. *See* A.R. 809. The remainder are from Scott's treating family nurse practitioner, Yui Nishiike, FNP; they do not reflect treatment by a mental health specialist. While Scott may have occasionally reported to her family nurse practitioner that she was "doing well," the Ninth Circuit has cautioned that "[r]eports of 'improvement' in the context of mental health issues must be interpreted with an understanding of the patient's overall well-being and the nature of her symptoms." *Garrison v. Colvin*, 759 F.3d 995, 1017 (9th Cir. 2014). "They must also be interpreted with an awareness that improved functioning while being treated and while limiting environmental stressors does not always mean that a claimant can function effectively in a workplace." *Id*. The Ninth Circuit has cautioned that it is "error for an ALJ to pick out a few isolated instances of improvement over a period of months or years and to treat them as a basis for concluding a claimant is capable of working." *Id*. Notably, the ALJ did not mention one treatment note by FNP Nishiike from the same time period (which was during Scott's sobriety) that reflects Scott's complaints of increased anxiety, nightmares, increased heart rate, flashbacks, and "vague memory of assault [1.5 years ago] triggered by crowds and dark alleys." A.R. 811 (12/27/12 note).

Additionally, the record contains evidence contradicting the ALJ's conclusion that Scott had "much improved functioning" while sober. Specifically, in 2015, over two years into Scott's most recent period of sobriety, Scott's treating therapist MFTI Jones opined that Scott demonstrated symptoms including impairment in impulse control, mood disturbance, and emotional lability, and had marked and moderate impairments in several functional areas. *See* A.R. 1042-1046.

The court concludes that the ALJ failed to provide specific and legitimate reasons supported by substantial evidence to discount Dr. Wiebe's opinion.

### b. MFTI Jones & Dr. Franklin

MFTI Jones, under Dr. Franklin's supervision, opined that Scott's impairments would cause her to miss work more than four days per month, and assessed marked and moderate impairments in Scott's functional abilities. *See* A.R 1042-1046. Because the opinion contradicted Dr. Prosise's opinion, the ALJ was required to provide "specific and legitimate reasons" supported

18

by substantial evidence to reject the Jones/Franklin opinion.  *Lester*, 81 F.3d at 830.[2]

The ALJ stated two reasons for according the opinion little weight: 1, that "their opinion is not supported by the evidence of record relating to the periods when the claimant has been sober" and 2, that "their opinion is . . . not supported by the underlying mental health treatment notes from Patricia Jones, indicating that the claimant's difficulties are due in large part to financial problems and difficulty getting a job" and that the notes indicate that Scott had made "positive progress in the therapy sessions."  A.R. 29.

As discussed above, the statement that Scott had improved functioning while sober is not a legally sufficient reason to discount the Jones/Franklin opinion.  Similar to Dr. Wiebe's opinion, MFTI Jones and Dr. Franklin treated Scott and wrote their opinion while Scott had been sober.  In the case of the Jones/Franklin report, Scott had been sober for over two years at the time of the report.

Next, the ALJ wrote that Jones's treatment notes indicated that Scott's difficulties were "due in large part to financial problems and difficulty getting a job."  The record contains 13 "progress notes" documenting Jones's sessions with Scott.  A.R. 1018-1041.  The ALJ's statement about the source of Scott's difficulties mischaracterizes those notes, since each progress note contains a lengthy list of 9 to 14 "issues discussed in this therapy session," such as negative intrusive thoughts, feeling anxious, frequent crying, and feeling overwhelmed.  "Financial problems" and "difficulty finding a job" are just two of the issues Scott discussed with Jones.  *See id*.  The progress notes do not contain any notation or indication by Jones that financial problems and difficulty finding a job were largely responsible for Scott's difficulties.

Finally, the ALJ wrote that Jones's treatment notes indicated that Scott had made "positive progress" in her sessions, including "crying less frequently, more willing to discuss important issues in therapy, able to identify distorted thinking, positive self-statements, fewer negative

---

[2] The Commissioner argues that as an intern, MFTI Jones is not an acceptable medical source, and that as there is no indication that Dr. Franklin "participated in Plaintiff's care in any way," the ALJ was required only to give germane reasons for rejecting Jones's opinion.  Opp'n 11 (citing *Bayliss v. Bowen*, 427 F.3d 1211, 1218 (9th Cir. 2005)).  This ignores the fact that the ALJ drew no distinction between MFTI Jones and Dr. Franklin and repeatedly referred to the Jones/Franklin opinion as "their opinion."  *See* A.R. 29.

1    intrusive thoughts and less obsessing." A.R. 29-30. While this is an accurate representation of the

2    notes, which do include such observations, it is not inconsistent for Scott to have demonstrated

3    progress in therapy with Jones while still experiencing impairments in several areas of her

4    functioning, as Jones opined.

5        The court concludes that the ALJ failed to provide specific and legitimate reasons

6    supported by substantial evidence to discount the Jones/Franklin opinion.

7                        **c.    Dr. Funkenstein & Dr. Mallare**

8        State agency psychological consultants Drs. Funkenstein and Mallare opined in August

9    2012 and May 2013, respectively, that Scott has moderate impairments in the numerous areas,

10   including understanding and remembering detailed instructions, attention and concentration, and

11   interacting appropriately with the general public. Both opined that Scott is capable of performing

12   non-public, simple repetitive tasks when clean and sober. The ALJ accorded these opinions little

13   weight, writing that Scott's "functional limitations are mild to moderate when sober," and that

14   "[a]s discussed above, the evidence of record does not support more than mild functional

15   limitations when the claimant is sober." A.R. 30.

16       As discussed above in connection with the opinions of Dr. Wiebe and MFTI Jones and Dr.

17   Franklin, this is not a specific and legitimate reason supported by substantial evidence to discount

18   the opinions, namely because all of the records the ALJ cites in support of her statement that Scott

19   had "much improved functioning" while sober are from a limited period of time and from only one

20   provider, and only one of the five records is from a mental health specialist. Accordingly, the

21   court finds that the ALJ erred with respect to the opinions of Drs. Funkenstein and Mallare.

22                        **d.    Dr. Pancho & Dr. Ligot**

23       State agency medical consultants Dr. Pancho and Dr. Ligot each opined that Scott has the

24   severe impairment of "dysfunction—major joints" and that Scott is limited with pushing and

25   pulling in her lower extremities due to a history of "chronic foot pain due to bunion deformities

26   s/p bunionectomy on the left." As discussed above, the ALJ did not mention or discuss these

27   opinions at all in her decision, and did not include any physical limitations in her assessment of

28   Scott's ability to perform basic work activities. *See* A.R. 25. Ignoring portions of a physician's

opinion is considered an implicit rejection of those opinions and failure to offer reasons for doing so is legal error. *Smolen*, 80 F.3d at 1286. An ALJ may only "reject the opinion of a non-examining physician by reference to specific evidence in the medical record." *Sousa*, 143 F.3d at 1244. Given this requirement, the ALJ erred when she ignored the opinions of Drs. Pancho and Ligot, and it cannot be said that "substantial evidence" supports the ALJ's conclusion that in the absence of alcohol abuse, Scott's limitations would not cause more than a minimal impact on her ability to perform basic work activities, including physical functions such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling." *See* A.R. 25.[3]

### C. Scott's Remaining Arguments

Scott also argues that the ALJ erred in determining that her substance use is material and erred in assessing Scott's credibility. The court does not reach these arguments in light of its conclusion that the ALJ erred in determining and assessing Scott's mental and physical impairments and erred in weighing the medical opinions. These errors impacted the ALJ's ultimate conclusion that if Scott "stopped the substance use, the remaining limitations would not cause more than a minimal impact on [her] ability to perform basic work activities; therefore, [Scott] would not have a severe impairment or combination of impairments." A.R. 25. Under these circumstances, it makes sense on remand for the ALJ to reevaluate the materiality and credibility determinations upon reevaluation of the medical evidence and Scott's mental and physical impairments.

//

//

//

---

[3] In a footnote, Scott also challenges the ALJ's failure to address and weigh the opinions of MHT Bagnell and Dr. Yavneh when discussing her impairments. Mot. 14 n.4. The ALJ wrote that she gave the opinion "some weight," noting Bagnell's statement that Scott has difficulty interacting with others and that "her concentration and task completion has changed as a result of her mental condition" but that Bagnell admittedly had not administered testing to determine her level of attention. A.R. 25, 567. The court finds no error with respect to that opinion, as Bagnell did not offer other definitive opinions about Scott's capacity for work.

United States District Court
Northern District of California

## VII.    CONCLUSION

For the foregoing reasons, the court grants in part Scott's motion, denies the
Commissioner's cross-motion, and remands this case for further proceedings.

**IT IS SO ORDERED.**

Dated: November 13, 2018



Donna M. Ryu
United States Magistrate Judge
Judge Donna M. Ryu

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28